FEE PAID

FILED
CLERK, U.S. DISTRICT COURT

10/11/21

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ DEPUTY
CS

Evgenia Quaid, Pro Se
Randy Quaid, Pro Se
7600 Chevy Chase Drive
Chase Park, Suite 300, Quaid Films Austin, TX, 78752
802-453-7250
eliza.George@Mail.be

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| RANDY QUAID, an individual; EVGENIA QUAID, an individual, | ) ) ) | CV21-8127-CBM(Ex) |
| Plaintiffs | ) ) | **COMPLAINT TO QUIET TITLE AND FOR DECLARATORY RELIEF** |
| v. | ) ) | |
| R. SCOTT TURICCHI, an Individual; ALL PERSONS UNKNOWN AND KNOWN, CLAIMING ANY LEGAL OR EQUITBLE RIGHT, TITLE, ESTATE, LIEN, OR INTEREST IN THE PROPERTY DESCRIBED IN HTE COMPLAINT ADVERSE TO PLAINTIFFS' TITLE, OR ANY CLOUD ON PLAINTIFFS' TITLE THERETO,; and DOES ONE through FIFTY, inclusive, | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants | ) | |

## I. NATURE OF THE ACTION

Randy Quaid and Evgenia Quaid ("Plaintiff" or "the Quaids'), by and through their own counsel, bring this Quiet Title action against Scott Turicchi et al ("Turicchi"), and allege as follows:

## JURISDICTION AND VENUE

1.     This Court has federal question jurisdiction under 28 U.S.C. § 1332(a). Plaintiff is domiciled in the State of Texas. No defendant is citizen of the State of Texas or domiciled in the State of Texas. Defendant Berman is domiciled in the State of California. Defendant Scott Turicchi is domiciled in the State of California. Defendant Equity Title Company is citizen of California and New Jersey.

2.     The Amended Complaint attempts to quiet title over the subject Property. When the amount of damages is unspecified, the removing Defendant must prove by a preponderance of the evidence that the amount in controversy exceeds $75,000. Sierminski v. Transouth Financial Corp., 216 F.3d 945, 947–48 (11th Cir.2000) (quoting Tapscott v. MS Dealer Service Corp., 77 F.3d 1353, 1356–57 (11th Cir.1996), overruled on other grounds). In this case, the amount in controversy is measured by the value of the object of the litigation, "that is, the property's undisputed fair market value." Ballew v. Roundpoint Mortgage Servicing Corp.,491 Fed.Appx. 25, 26 (11th Cir.2012). The Federal Housing Finance Agency ("FHFA") calculates the October 11, 2021 value for the Montecito

Property to be $4,947,000.00.  Plaintiffs paid $1,350,000.00 for the property in October 1989.

The market Value of the Property is greater that the $75,000 amount in dispute requirement for diversity jurisdiction.

3.      This Court has diversity jurisdiction over the parties pursuant to 28 U.S.C. § 1332 because Plaintiff is resident of different state than the Defendants and the amount in controversy exceeds $75,000, exclusive of interest and cost.

4.      Venue in this judicial district is proper under 28 U.S.C. §§ 1391 (b)(2) because a substantial part of the events giving rise to this claim occurred in this judicial district, as described herein.

## PARTIES

5.      Plaintiff Randy Quaid et al is the owner of the Montecito Property. Plaintiff is a resident of Texas.

6.      Plaintiff is informed and believes that Defendant R. Scott Turicchi is an in individual domiciled in Los Angeles, California.

## COMMON FACTUAL ALLEGATIONS

7.      The real property which is the subject of this causes of action is commonly known as 1355/57 East Mountain Drive, Montecito, CA 93108 (hereinafter referred to as the "Montecito Property"), and is legally described as follows:

That certain tract of land in the County of Santa Barbara, State of California, shown and designated as Parcel "A" on Parcel Map No. 11669 filed December 22, 1972 in Book 11, Page 30 of Parcel Maps in the office of the County Recorder of said County.

Assessor's Parcel N: 011-050-054.

8.      Plaintiff is the owner in fee simple absolute of the Montecito Property by virtue of a sale conducted on <u>October 23, 1989</u>, and a Grant Deed Upon Sale recorded October 25,1989, as Instrument No. 89-071461 of the Official Records of Santa Barbra County, California (a true and correct certified copy of which is attached hereto as **Exhibit "A"**). (Also see a true and correct copy to the Parcel Map of the Montecito Property attached hereto as **Exhibit "A1"**).

9.      After Plaintiff acquired title to the Montecito Property as alleged above, Bruce Berman, without any right whatsoever, recorded a Grant Deed purportedly transferring title to the Montecito Property from Plaintiff to Berman. The Grant Deed was dated November 11, 1991 and recorded 15 January, 1992, as Instrument No. 92-002539 of Official Records of Santa Barbra County, California (hereinafter referred to as the "Berman Deed", a true and correct certified copy of the void Berman Deed which is attached hereto as **Exhibit "B"**).

10.     On the same day Berman also caused to be recorded into the County records a Deed of Trust Instrument No. 92-002540 (hereinafter the "Berman Deed of Trust". A Certified Copy of the void Berman Deed of Trust, Instrument No: 92-002540 is attached hereto as **Exhibit "C"**.).

11.     Both the forged Quaid/Berman Grant Deed and the Berman Deed of
Trust are void instruments. Herein, each instrument in particular and specifically is
examined and identified as such.

12.     The Berman Grant Deed, although purportedly executed by Bruce
Berman, is void and of no force or effect because Randy Quid, the valid owner of
the Montecito Property, has never signed the Berman Deed. According to the
Expert Report made by Douglas A. Cobb dated April 2, 2021, on forensic
examination of the questioned 'Grant Deed' [the Berman Deed] for Randy and
Evgenia Quaid (hereinafter referred to as the "Expert Report", a true and correct
copy of which is attached hereto as **Exhibit "D"**), the expert made the following
professional opinion, *"There are several noted characteristics and significance
inconsistent between the Q1 'Grant Deed' disputed Randy R. Quaid signature and
K1-K16 known handwriting exemplars of Randy Quaid. It is professional opinion
that it is strong probability the author of the known signatures of "Randy Quaid on
the K1-K16 documents did not author the questioned signature of 'Randy R.
Quaid' on Q1 document. 2. In addition, to the questioned signature of Mr. Quid,
the authenticity of the Q1 'Grant Deed' is questionable due to the misspelling of
Evgenia's name throughout the document and the questionable traits in the
Notary's signature."* Thus, Randy Quaid's signature was forged in the Berman
Deed. Randy Quaid has never transferred the Montecito Property to Bruce Berman,
nor to Berman's wife. Bruce Berman was not the owner of the Montecito Property

on November 11, 1991, and has never been the owner of the Montecito Property; the Montecito Property having been previously sold to Randy Quaid.

13.    After Plaintiff acquired title to the Montecito Property as alleged above, Berman without any right whatsoever, recorded a Deed of Trust purportedly from Berman to SMS Trust Deed Service ("SMS Trust") to the Montecito Property. The Deed of Trust was dated January 8, 1992 and recorded 15 January, 1992, as Instrument No. 92-002540 of Official Records of Santa Barbra County, California (hereinafter referred to as the "SMS Trust Deed" (Please see Exhibit "C").  (A true and correct copy of the California Bureau of Real Estate license page for SMS Trust Deed Service is attached hereto as **Exhibit "E"**.)

14.    The SMS Trust Deed, although purportedly executed by Bruce Berman, is void and of no force or effect because Bruce Berman was not the owner of the Montecito Property on January 8, 1992, and has never been the owner of the Montecito Property.  The Parcel Map Number on the SMS Trust Deed is incorrect and identifies a parcel of real property that does not exist in Santa Barbara County. Also, the "Trustee" designated in the document, "SMS Trust Deed Service," did not exist when the SMS Trust Deed was created and recorded.

15.    After Plaintiff acquired title to the Montecito Property as alleged above, Berman, without any right whatsoever, signed a Grant Deed dated July 6, 2007 purportedly transferring title to the Montecito Property from Berman to R. Scott Turicchi et al. This Grant Deed was recorded into the Santa Barbara County

Recorder's Office on August 21, 2007 as Instrument No. 2007-0060403

(hereinafter referred to as the "Turicchi Deed."  A true and correct certified copy of

which is attached hereto as **Exhibit "F"**).

16.     The Turicchi Deed, although purportedly executed by Bruce Berman

who is identified on the document as "Grantor," is void and of no force or effect

because Bruce Berman was not the owner of the Montecito Property on July 6,

2007, and has never been the owner of the Montecito Property.

17.     R. Scott Turicchi et al is not a bona fide purchaser of the Montecito

Property due to Turicchi's reliance on the Berman Grant Deed being a forged, void

instrument of transfer. California common law is well-settled that a forge grant

deed is void ab initio and cannot convey good valid title to an innocent third-party

purchaser. Therefore, Turicchi is not the owner of the Montecito Property.

**R. Scott Turicchi**

18.     Scott Turicchi is currently the subject of multiple SEC sanctioned

class-action lawsuits in the United States District Court Central District of

California, alleging he committed securities fraud as president and chief financial

officer of publicly traded corporation J2 Global Inc. One of the lawsuits, *Jeffrey*

*Garcia v. J2 Global, Inc., et al,* Case No. 2:20-cv-06096, identifies 81 instances of

R. Scott Turicchi lying to his investors and to the investment community at large.

19.     Additionally, in a separate matter, Turicchi's company negotiated a

plea bargain agreement in 2019 with four California District Attorneys representing

Los Angeles, Santa Clara, San Diego, and Santa Cruz Counties, and the City

Attorney of Santa Monica, California for J2's fraudulent charges to the holders of

credit cards who had signed up for the company's free trial offer promoting its

goods and services, but had opted out upon expiration of the free offer.

20.     Scott Turicchi's title insurer is Fidelity National Title Inc. ("FNF").

His title policy's "Covered Risks" affords him protection against forged and

improperly signed documents in the Montecito Property's chain of title. For

instance the third paragraph under "Covered Risks" states:

> *3.  Someone else claims to have rights affecting Your Title arising out of forgery or impersonation."*

And Paragraph 27 in the same section reads:

> *27.  A document upon which Your Title is based is invalid because it was not properly signed, sealed, acknowledged, delivered or recorded."*

(A true and correct copy of Turicchi's title insurance policy is attached hereto as

**Exhibit "G.")**.

21.     Turicchi is willfully interfering with his own title insurance policy by

not allowing the protective mechanism in his policy's Covered Risks to activate to

his own advantage. Instead of taking advantage of his very comprehensive

insurance policy Turicchi has sought instead to manufacture a controversy with

FNF.

22.     Turicchi has created a false controversy with his title insurer for two reasons:

1.     Turicchi does not want FNF to investigate the underlying facts of the Quaids' claim that the Berman Grant Deed is a forged, void instrument.

2.     Turicchi does not want FNF to appraise the Montecito Property only to discover it is currently grossly overvalued, that its current overvaluation is due directly to a fraudulent appraisal commissioned by Turicchi when he hired an appraiser from outside the County who was unfamiliar with property valuations in Montecito, and who had a disciplinary history with the California Bureau of Real Estate Appraisers for overvaluing property.

23.     Plaintiffs are informed and believe and, based on that information and belief, allege that Turicchi knows that the Berman Grant Deed is a forged, void instrument of transfer.

24.     The 2021 forensic analysis in the Expert Report of Plaintiff Randy Quaid's forged signature and other evidence in Plaintiffs' possession reveals the Berman Grant Deed is void ab initio due to it being a forged instrument, thereby preventing Turicchi from achieving the status of bona fide purchaser of the Montecito Property.

25.     The resolution for Turicchi as to this problem is and has always been readily available to him through the Covered Risks clauses in his title insurance policy cited above that protect him from forged and improperly signed documents.

26.     In a civilized world, Turicchi, relying on the terms of his title insurance policy, would reasonably and rightfully expect his insurer, FNF, to either bring an action against his seller, Berman, or cover Turicchi for his loss, citing the Quaids' new forensic forgery evidence in the Expert Report and other key pieces of evidence in Quaids' possession as sufficient proof for FNF to act on Turicchi's behalf.  However, instead of getting out of his own way and allowing his title insurer to resolve the matter of the forgery, Turicchi chooses instead to retain counsel at his own expense to fight the party from whom his seller stole the property. It makes absolutely no sense.

27.     Turicchi is interfering with his insurance policy. By doing so he is willfully interfering with Plaintiffs' property rights.

28.     California law is well-settled that a forged grant deed is a void instrument that cannot convey good, valid title, not even to an innocent third party purchaser. *"[A]n instrument wholly void, such as an undeliverable deed, a forged instrument, or a deed in blank, cannot be made the foundation of a good title, even under the equitable doctrine of bona fide purchase."* See *Trout v. Taylor,* 32 P.2d 968, 970 (Cal. 1934); *Green v. MacAdam* 175 Cal.App.2d 481 (Cal. Ct. App. 1959) ( *Promis v. Duke,* 208 Cal. 420 [ 281 P. 613]; *Gould v. Wise,* 97 Cal. 532 [32 P. 576, 33 P. 323]; *Bardin v. Grace* ( 167 Ala. 453 [52 So. 425, Ann. Cas. 1912A, 537].) " . . . "[I]n line with the great weight of authority, it has been held in this state (California) '***that the fraudulent procurement of a deed deposited as an escrow***

*from the depository by the grantee named therein will not operate to pass the*

*title, and the subsequent purchaser from such grantee, without notice, and for a*

*valuable consideration, derives no title thereby, and will not be protected.'"*

(*Gould v. Wise,* 97 Cal. 532, 536 [32 P. 576, 577, 33 P. 323].). (Boldface added for

emphasis). Thus, Turicchi never achieved status as a bona fide purchaser of the

Montecito Property.

29.     Berman, when he caused the Berman Grant Deed to be forged and

recorded he essentially executed the deed in blank, thus creating a void instrument.

*"According to the great weight of authority, a deed executed in blank is void and*

*passes no title."* ( *Wunderlin v. Cadogan,* 50 Cal. 613, and cases cited, infra.)

Berman also created a grant deed in which there was no grantor. "As was said in

*Whitaker v. Miller,* 83 Ill. 381, `there must be, in every grant, a grantor, a grantee

and a thing granted, and a deed wanting in either essential is absolutely void.'"

*Green v MacAdam* (175 Cal.App.2d 485 (Cal. Ct. App. 1959).  Again, Turicchi

relied on the Berman Grant Deed to transfer ownership to him, but the Berman

document is absolutely void and did not convey to Turicchi good, valid title.

30.     California law is well-settled that an owner of property who discovers

a forged grant deed clouding his chain of title is not subject to a statute of

limitations that obligates him to take action unless compelled to do so by an

adverse legal claim challenging  ownership.  In 1965, California Supreme Court

Chief Justice Traynor, citing the court's decision in *Muktarian v Barmby*, discussed

the general rule that the statute of limitations for a quiet title action does not run against a party in possession of the land and identified at least part of the rationale for the limited qualification: *"[N]o statute of limitations runs against a plaintiff seeking to quiet title while he is in possession of the property. In many instances one in possession would not know of dormant adverse claims of persons not in possession. Moreover, even if, as here, the party in possession knows of such a potential claimant, there is no reason to put him to the expense and inconvenience of litigation until such a claim is pressed against him."* (*Muktarian,v Barmby*, *supra,* 63 Cal.2d at p. 560, 47 Cal.Rptr. 483, 407 P.2d, 659, fn. omitted, italics added). Thus, mere notice of an adverse claim is not enough to commence the owner's statute of limitations.

31.     The Berman and the Turicchi grant deeds are both void instruments. They are both documents with no force or power to convey real property. They are in essence — nothing.  As such the Berman/Turicchi void grant deeds do not disturb Plaintiffs' title, ownership, estate, lien or interest in the Montecito Property. The Berman/Turicchi documents are merely a cloud on the Montecito Property's chain of title that Plaintiffs now seek to be removed from the Official Records of Santa Barbara County.

### FIRST CLAIM FOR RELIEF: QUITE TITLE
(By Plaintiff Against Turicchi)

32.     Plaintiff realleges and incorporates by reference each of the allegations in paragraphs 1 through 31 set forth above, inclusive, with the same force and effect as through fully set forth herein.

33.     Plaintiff is informed and believes and on that basis alleges that defendant R. Scott Turicchi et al claims an interest adverse to Plaintiff's title in the Montecito Property. These claims are without any right and defendants have no legal cognizable right, title, estate, lien, or interest in the Montecito Property.

34.     Plaintiff seeks to quiet title against the claims of the Defendant R. Scott Turicchi et al as hereinabove alleged, claiming any legal or equitable right, title, estate, lien or interest in the Montecito Property adverse to Plaintiff's interest or any cloud on Plaintiff's interest.

## SECOND CLAIM FOR RELIEF: DECLARATORY RELIEF
(By Plaintiff Against Turicchi Et Al)

35.     Plaintiff realleges and incorporates by reference each of the allegations in paragraphs 1 through 34 set forth above, inclusive, with the same force and effect as through fully set forth herein

36.     The actual controversy has arisen and now exists between Plaintiff and Defendants concerning the rights on the Montecito Property.

37.     Turicchi declares that he is the owner of the property based on his own Grant Deed and the Berman Grant Deed.

38.     Plaintiff contends that he is the owner in fee title absolute of the Montecito Property based on the Grand Deed Upon Sale. Randy Quaid's signature was forged in the Berman Deed. The Berman Deed is void ab initio and of no force or effect because Randy Quid, the owner of the Montecito Property, never signed the Berman Deed.

39.     Turicchi declares that he is an owner of the Montecito Property based on the Turicchi Deed.

40.     Plaintiff contends that he is the owner in fee title absolute of the Montecito Property based on the Grant Deed Upon Sale. The Turicchi Deed, although purportedly executed by Bruce Berman, is void and of no force or effect because Bruce Berman was not the owner of the Montecito Property on July 6, 2007, and has never been the owner of the Montecito Property.

WHEREFORE, Plaintiff prays judgment against Defendants, and each of them, as follows:

1.     For a judgment and order that the Berman Grant Deed, the SMS Trust Deed, and the Turicchi Grant Deed are of no force and effect whatsoever, and as such, have no impact on the Montecito Property, that Defendants have no right, title, estate, lien or interest in the Montecito Property and that Plaintiff is the owner in fee title absolute, clear of any claims by Defendants;

2.     Declaration of the parties' rights concerning the Montecito Property and respectfully request the Court to declare the Berman Deed, the SMS Trust

Deed, the Turicchi Deed are of no force and effect; Plaintiff respectfully requests the Court to declare Defendants have no right, title, estate, lien or interest in the Montecito Property; and Plaintiff respectfully requests the Court to declare Plaintiff is the owner in fee title absolute;

3.     That the Court Order an appraisal be conducted of the Montecito Property for the purpose of ascertaining its true current value.

4.     For a judgment and order that Defendant R. Scott Turicchi et al pay costs and attorney fees for the removal from the Montecito Property's chain of title the Forged Berman Grant Deed, the SMS Deed of Trust and the Turicchi Grant Deed, and all trusts and assigned documents related to these Berman and Turicchi instruments.

5.     For a judgment requiring Defendant to pay Plaintiff's costs, including attorneys' fees pursuant to 17 U.S.C. § 505; and

6.     Such other and further relief as the Court may deem just and proper.

Respectfully submitted,

DATED:  October 11, 2021                    BY: /s/  Randy Quaid RANDY QUAID
                                                                Randy Quaid, Pro Se

                                                        /s/  Evgenia Quaid EVGENIA QUAID
                                                                Evgenia Quaid, Pro Se

# EXHIBIT A

# EXHIBIT A

# EXHIBIT A

RESTRICTIVE COVENANT COVER PAGE TO BE ATTACHED TO ALL PUBLIC AND
OFFICIAL RECORDS COPIES

12956.1. (a) As used in this section, "association," "governing documents," and "declaration" have the same meanings as set forth in Section 1351 of the Civil Code.

(b) (1) A county recorder, title insurance company, escrow company, real estate broker, real estate agent, or association that provides a copy of a declaration, governing document, or deed to any person shall place a cover page or stamp on the first page of the previously recorded document or documents stating, **in at least 14-point boldface type, the following:**

**"If this document contains any restriction based on race, color, religion, sex, sexual orientation, gender, gender identity, gender expression, genetic information, familial status, marital status, disability, national origin, source of income as defined in subdivision (p) of Section 12955, or ancestry, that restriction violates state and federal fair housing laws and is void, and may be removed pursuant to Section 12956.2 of the Government Code. Lawful restrictions under state and federal law on the age of occupants in senior housing or housing for older persons shall not be construed as restrictions based on familial status."**

1493restr.covenant.coversheet.doc

Recording Requested By
First American Title Insurance Co.

Order No.
Escrow No.   SB-1374423-PW
Loan No.

WHEN RECORDED MAIL TO:

Mr. and Mrs. Randall R. Quaid
c/o Goldman, Grant & Tani, Inc.
10960 Wilshire Blvd., #938
Los Angeles, CA  90024

| 89-071461 | Rec Fee | 5.00 |
| Recorded | DOC | 1485.00 |
| Official Records | SUR | 10.00 |
| County of | Total | 1500.00 |
| Santa Barbara | | |
| Kenneth A Pettit | | |
| Recorder | | |
| 8:00am 25-Oct-89 | | RO   1 |

SPACE ABOVE THIS LINE FOR RECORDER'S USE

MAIL TAX STATEMENTS TO:

Same Addressee as Above

DOCUMENTARY TRANSFER TAX $ 1,485.00

XX Computed on the consideration or value of property conveyed; OR
...... Computed on the consideration or value less liens or encumbrances
remaining at time of sale.

*[signature]* FATCO

Signature of Declarant or Agent determining tax — Firm Name

A.P. 11-050-54

**MONUMENT SURVEY-$10.00**

## GRANT DEED

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,

MICHAEL JAFFE, a married man as his separate property who acquired title as a single
man; and JANN JAFFE, his wife
hereby GRANT(S) to

RANDALL R. QUAID and EUGENIA H. QUAID, husband and wife as joint tenants

the real property in the ~~City of~~ unincorporated area of the
County of     Santa Barbara                                         , State of California, described as

That certain tract of land in the County of Santa Barbara, State of California,
shown and designated as Parcel "1" on Parcel Map No. 11669 filed December 22, 1972
in Book 11, Page 30 of Parcel Maps in the office of the County Recorder of said
County.

Jann Jaffe, wife of Michael Jaffe joins in the
execution of this Grant Deed to acknowledge that
the property described herein is the separate property
of Michael Jaffe.

Dated     October 20, 1989

STATE OF CALIFORNIA            }ss.
COUNTY OF  Santa Barbara
On     October 21, 1989
before me, the undersigned, a Notary Public in and for said State, per-
sonally appeared    MICHAEL JAFFE and
                    JANN JAFFE

personally known to me (or proved to me on the basis of satisfactory
evidence) to be the person(s) whose name(s) is/are subscribed to the
within instrument and acknowledged to me that he/she/they executed
the same.
WITNESS my hand and official seal.
Signature  *[signature]*

MICHAEL JAFFE  *[signature]*
JANN JAFFE  *[signature]*



OFFICIAL SEAL
PATRICIA S. WHITE
NOTARY PUBLIC - CALIFORNIA
SANTA BARBARA COUNTY
My Comm. Expires Oct. 24, 1991

(This area for official notarial seal)

1002 (6/82)

MAIL TAX STATEMENTS AS DIRECTED ABOVE

This is a true certified copy of the original document on file or of record in my office. It bears the seal and signature, imprinted in purple ink of the County Clerk, Recorder and Assessor.

COUNTY CLERK, RECORDER AND ASSESSOR, SANTA BARBARA CALIFORNIA
DATE: AUG 0 5 2015   BY DEPUTY:

# EXHIBIT A-1

# EXHIBIT A-1

# EXHIBIT A-1



# EXHIBIT B

# EXHIBIT B

# EXHIBIT B

---

**RESTRICTIVE COVENANT COVER PAGE TO BE ATTACHED TO ALL PUBLIC AND OFFICIAL RECORDS COPIES**

---

12956.1. (a) As used in this section, "association," "governing documents," and "declaration" have the same meanings as set forth in Section 1351 of the Civil Code.

(b) (1) A county recorder, title insurance company, escrow company, real estate broker, real estate agent, or association that provides a copy of a declaration, governing document, or deed to any person shall place a cover page or stamp on the first page of the previously recorded document or documents stating, **in at least 14-point boldface type, the following:**

**"If this document contains any restriction based on race, color, religion, sex, sexual orientation, gender, gender identity, gender expression, genetic information, familial status, marital status, disability, national origin, source of income as defined in subdivision (p) of Section 12955, or ancestry, that restriction violates state and federal fair housing laws and is void, and may be removed pursuant to Section 12956.2 of the Government Code. Lawful restrictions under state and federal law on the age of occupants in senior housing or housing for older persons shall not be construed as restrictions based on familial status."**

1493restr.covenant.coversheet.doc

RECORDING REQUESTED BY

EQUITY TITLE COMPANY

AND WHEN RECORDED MAIL THIS DEED AND , UNLESS OTHERWISE SHOWN BELOW,
MAIL TAX STATEMENTS TO:

| NAME | BRUCE BERMAN |
| ADDRESS | 7740 FLYNN RANCH ROAD |
| CITY & STATE ZIP | LOS ANGELES, CA 90046 |

Title Order No. _____ Escrow No. 32030-LN

| 92-002539 | Rec Fee | 5.00 |
| Recorded | SUR | 10.00 |
| Official Records | Total | 15.00 |
| County of | | |
| Santa Barbara | | |
| Kenneth A Pettit | | |
| Recorder | | |
| 8:00am 15-Jan-92 | ETCO | BC 1 |

SPACE ABOVE THIS LINE FOR RECORDER'S USE

APN NO. 011-050-54

# GRANT DEED

MONUMENT SURVEY - $10.00

STAMPS AFFIXED
AFTER RECORDING

The undersigned declares that the documentary transfer tax is $ ON REVERSE _____ city tax $ _____ and is
☒ computed on the full value of the interest or property conveyed, or is
☐ computed on the full value less the value of liens or encumbrances remaining thereon at the time of sale. The land, tenements or realty is located in
☒ unincorporated area  ☐ city of _____

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,

RANDALL R. QUAID AND EUGENIA H. QUAID, HUSBAND AND WIFE,

hereby GRANT(S) to   BRUCE BERMAN AND NANCY BERMAN, HUSBAND AND WIFE, AS COMMUNITY PROPERTY,

the following described real property in the     UNINCORPORATED AREA OF THE
county of   SANTA BARBARA                        , state of California:

THAT CERTAIN TRACT OF LAND IN THE COUNTY OF SANTA BARBARA, STATE OF
CALIFORNIA, SHOWN AND DESIGNED AS PARCEL "A" ON PARCEL MAP NO. 11669,
FILED DECEMBER 22, 1972, IN BOOK 11, PAGE 30 OF PARCEL MAPS, IN THE OFFICE
OF THE COUNTY RECORDER OF SAID COUNTY.

Dated _____ NOVEMBER 11, 1991 _____

RANDALL R. QUAID

EUGENIA H. QUAID

STATE OF CALIFORNIA
COUNTY OF ___ LOS ANGELES ___

On this the ___ day of _November 91_, before me,
the undersigned Notary Public,
personally appeared ___RANDALL R. QUAID___
AND EUGENIA H. QUAID

☐ personally known to me
☒ proved to me on the basis of satisfactory evidence
to be the person(s) whose name(s) ___ARE___ subscribed to the within
instrument and acknowledged to me that ___THEY___ executed the same
to ___THEIR___ authorized capacity(ies) and that by ___THEIR___ signature(s)
on the instrument the person(s) or the entity upon behalf of which the person(s) acted,
executed the instrument.

WITNESS my hand and official seal.

_____
Notary's Signature

FOR NOTARY SEAL OR STAMP

OFFICIAL SEAL
RORI ALYSE FREED
Notary Public - California
SAN DIEGO COUNTY
My Comm. Exp. May 31, 1993

MAIL TAX STATEMENTS TO PARTY SHOWN ON FOLLOWING LINE:  IF NO PARTY SO SHOWN, MAIL AS DIRECTED ABOVE

| Name | Street Address | City & State |

ET-137  (Rev. 8-91)

This is a true certified copy of the original document on file or of record in my office. It bears the actual signature, reproduced in purple ink of the County Clerk, Recorder and Assessor.

COUNTY CLERK, RECORDER AND ASSESSOR, SANTA BARBARA CALIFORNIA
DATE: JUL 3 1 2015   BY DEPUTY:

# EXHIBIT C

# EXHIBIT C

# EXHIBIT C

RESTRICTIVE COVENANT COVER PAGE TO BE ATTACHED TO ALL PUBLIC AND OFFICIAL RECORDS COPIES

12956.1. (a) As used in this section, "association," "governing documents," and "declaration" have the same meanings as set forth in Section 1351 of the Civil Code.

(b) (1) A county recorder, title insurance company, escrow company, real estate broker, real estate agent, or association that provides a copy of a declaration, governing document, or deed to any person shall place a cover page or stamp on the first page of the previously recorded document or documents stating, **in at least 14-point boldface type, the following:**

**"If this document contains any restriction based on race, color, religion, sex, sexual orientation, gender, gender identity, gender expression, genetic information, familial status, marital status, disability, national origin, source of income as defined in subdivision (p) of Section 12955, or ancestry, that restriction violates state and federal fair housing laws and is void, and may be removed pursuant to Section 12956.2 of the Government Code. Lawful restrictions under state and federal law on the age of occupants in senior housing or housing for older persons shall not be construed as restrictions based on familial status."**

1499restr.covenant.coversheet.doc

WHEN RECORDED RETURN TO:

· CrossLand Savings, FSB
15260 Ventura Blvd, Suite 230
Sherman Oaks, CA  91403

RECORDING REQUESTED BY

EQUITY TITLE COMPANY

91-32030-50

| | |
|---|---|
| 92-002540 | Rec Fee   32.00 |
| | Total      32.00 |
| Recorded | |
| Official Records | |
| County of | |
| Santa Barbara | |
| Kenneth A Pettit | |
| Recorder | |
| 8:00am 15-Jan-92 | ETCO   BC  10 |

[Space Above This Line For Recording Data]

# DEED OF TRUST

THIS DEED OF TRUST ("Security Instrument") is made on  JANUARY 8, 1992                . The trustor is
BRUCE BERMAN AND NANCY BERMAN, HUSBAND AND WIFE AS COMMUNITY
PROPERTY.

("Borrower"). The trustee is  SMS Trust Deed Service, A California Corporation

("Trustee"). The beneficiary is  CrossLand Savings, FSB

which is organized and existing under the laws of  THE STATE OF UTAH                                    , and whose
address is  860 East 4500 South
Salt Lake City, UT  84107                            ("Lender"). Borrower owes Lender the principal sum of
SEVEN HUNDRED SEVENTY THOUSAND AND NO /100

Dollars (U.S. $ 770,000.00            ).
This debt is evidenced by Borrower's note dated the same date as this Security Instrument ("Note"), which provides for
monthly payments, with the full debt, if not paid earlier, due and payable on  FEBRUARY 1, 2022                   .
This Security Instrument secures to Lender: (a) the repayment of the debt evidenced by the Note, with interest, and all renewals,
extensions and modifications of the Note; (b) the payment of all other sums, with interest, advanced under paragraph 7 to
protect the security of this Security Instrument; and (c) the performance of Borrower's covenants and agreements under this
Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of
sale, the following described property located in   SANTA BARBARA                                       County, California:

PARCEL A OF PARCEL MAP NO. 11,699, IN THE COUNTY OF SANTA
BARBARA, STATE OF CALIFORNIA, AS SHOWN ON THE MAP FILED IN
BOOK 11, PAGE 30 OF PARCEL MAPS, IN THE OFFICE OF THE COUNTY
RECORDER OF SAID COUNTY.

which has the address of  1355 EAST MOUNTAIN DRIVE                          SANTA BARBARA [Street, City],
California      93108            ("Property Address");
          [Zip Code]

CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Page 1 of 8          Form 3005  9/90
-6R(CA) (9101)          VMP MORTGAGE FORMS - (313)293-8100 - (800)521-7291

GAS

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal and Interest; Prepayment and Late Charges.** Borrower shall promptly pay when due the principal of and interest on the debt evidenced by the Note and any prepayment and late charges due under the Note.

2. **Funds for Taxes and Insurance.** Subject to applicable law or to a written waiver by Lender, Borrower shall pay to Lender on the day monthly payments are due under the Note, until the Note is paid in full, a sum ("Funds") for: (a) yearly taxes and assessments which may attain priority over this Security Instrument as a lien on the Property; (b) yearly leasehold payments or ground rents on the Property, if any; (c) yearly hazard or property insurance premiums; (d) yearly flood insurance premiums, if any; (e) yearly mortgage insurance premiums, if any; and (f) any sums payable by Borrower to Lender, in accordance with the provisions of paragraph 8, in lieu of the payment of mortgage insurance premiums. These items are called "Escrow Items." Lender may, at any time, collect and hold Funds in an amount not to exceed the maximum amount a lender for a federally related mortgage loan may require for Borrower's escrow account under the federal Real Estate Settlement Procedures Act of 1974 as amended from time to time, 12 U.S.C. Section 2601 et seq. ("RESPA"), unless another law that applies to the Funds sets a lesser amount. If so, Lender may, at any time, collect and hold Funds in an amount not to exceed the lesser amount. Lender may estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with applicable law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is such an institution) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items. Lender may not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and applicable law permits Lender to make such a charge. However, Lender may require Borrower to pay a one-time charge for an independent real estate tax reporting service used by Lender in connection with this loan, unless applicable law provides otherwise. Unless an agreement is made or applicable law requires interest to be paid, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender may agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds, showing credits and debits to the Funds and the purpose for which each debit to the Funds was made. The Funds are pledged as additional security for all sums secured by this Security Instrument.

If the Funds held by Lender exceed the amounts permitted to be held by applicable law, Lender shall account to Borrower for the excess Funds in accordance with the requirements of applicable law. If the amount of the Funds held by Lender at any time is not sufficient to pay the Escrow Items when due, Lender may so notify Borrower in writing, and, in such case Borrower shall pay to Lender the amount necessary to make up the deficiency. Borrower shall make up the deficiency in no more than twelve monthly payments, at Lender's sole discretion.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender. If, under paragraph 21, Lender shall acquire or sell the Property, Lender, prior to the acquisition or sale of the Property, shall apply any Funds held by Lender at the time of acquisition or sale as a credit against the sums secured by this Security Instrument.

3. **Application of Payments.** Unless applicable law provides otherwise, all payments received by Lender under paragraphs 1 and 2 shall be applied: first, to any prepayment charges due under the Note; second, to amounts payable under paragraph 2; third, to interest due; fourth, to principal due; and last, to any late charges due under the Note.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines and impositions attributable to the Property which may attain priority over this Security Instrument, and leasehold payments or ground rents, if any. Borrower shall pay these obligations in the manner provided in paragraph 2, or if not paid in that manner, Borrower shall pay them on time directly to the person owed payment. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this paragraph. If Borrower makes these payments directly, Borrower shall promptly furnish to Lender receipts evidencing the payments.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender; (b) contests in good faith the lien by, or defends against enforcement of the lien in, legal proceedings which in the Lender's opinion operate to prevent the enforcement of the lien; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which may attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Borrower shall satisfy the lien or take one or more of the actions set forth above within 10 days of the giving of notice.

Form 3005   9/90

Page 2 of 6

**5. Hazard or Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage" and any other hazards, including floods or flooding, for which Lender requires insurance. This insurance shall be maintained in the amounts and for the periods that Lender requires. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's approval which shall not be unreasonably withheld. If Borrower fails to maintain coverage described above, Lender may, at Lender's option, obtain coverage to protect Lender's rights in the Property in accordance with paragraph 7.

All insurance policies and renewals shall be acceptable to Lender and shall include a standard mortgage clause. Lender shall have the right to hold the policies and renewals. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower.

Unless Lender and Borrower otherwise agree in writing, insurance proceeds shall be applied to restoration or repair of the Property damaged, if the restoration or repair is economically feasible and Lender's security is not lessened. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. If Borrower abandons the Property, or does not answer within 30 days a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may collect the insurance proceeds. Lender may use the proceeds to repair or restore the Property or to pay sums secured by this Security Instrument, whether or not then due. The 30-day period will begin when the notice is given.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of the payments. If under paragraph 21 the Property is acquired by Lender, Borrower's right to any insurance policies and proceeds resulting from damage to the Property prior to the acquisition shall pass to Lender to the extent of the sums secured by this Security Instrument immediately prior to the acquisition.

**6. Occupancy, Preservation, Maintenance and Protection of the Property; Borrower's Loan Application; Leaseholds.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within sixty days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate, or commit waste on the Property. Borrower shall be in default if any forfeiture action or proceeding, whether civil or criminal, is begun that in Lender's good faith judgment could result in forfeiture of the Property or otherwise materially impair the lien created by this Security Instrument or Lender's security interest. Borrower may cure such a default and reinstate, as provided in paragraph 18, by causing the action or proceeding to be dismissed with a ruling that, in Lender's good faith determination, precludes forfeiture of the Borrower's interest in the Property or other material impairment of the lien created by this Security Instrument or Lender's security interest. Borrower shall also be in default if Borrower, during the loan application process, gave materially false or inaccurate information or statements to Lender (or failed to provide Lender with any material information) in connection with the loan evidenced by the Note, including, but not limited to, representations concerning Borrower's occupancy of the Property as a principal residence. If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**7. Protection of Lender's Rights in the Property.** If Borrower fails to perform the covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture or to enforce laws or regulations), then Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the Property. Lender's actions may include paying any sums secured by a lien which has priority over this Security Instrument, appearing in court, paying reasonable attorneys' fees and entering on the Property to make repairs. Although Lender may take action under this paragraph 7, Lender does not have to do so.

Any amounts disbursed by Lender under this paragraph 7 shall become additional debt of Borrower secured by this Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

**8. Mortgage Insurance.** If Lender required mortgage insurance as a condition of making the loan secured by this Security Instrument, Borrower shall pay the premiums required to maintain the mortgage insurance in effect. If, for any reason, the mortgage insurance coverage required by Lender lapses or ceases to be in effect, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the mortgage insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the mortgage insurance previously in effect, from an alternate mortgage insurer approved by Lender. If substantially equivalent mortgage insurance coverage is not available, Borrower shall pay to Lender each month a sum equal to one-twelfth of the yearly mortgage insurance premium being paid by Borrower when the insurance coverage lapsed or ceased to be in effect. Lender will accept, use and retain these payments as a loss reserve in lieu of mortgage insurance. Loss reserve

Form 3006  9/90

payments may no longer be required, at the option of Lender, if mortgage insurance coverage (in the amount and for the period that Lender requires) provided by an insurer approved by Lender again becomes available and is obtained. Borrower shall pay the premiums required to maintain mortgage insurance in effect, or to provide a loss reserve, until the requirement for mortgage insurance ends in accordance with any written agreement between Borrower and Lender or applicable law.

9. Inspection. Lender or its agent may make reasonable entries upon and inspections of the Property. Lender shall give Borrower notice at the time of or prior to an inspection specifying reasonable cause for the inspection.

10. Condemnation. The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of any part of the Property, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender.

In the event of a total taking of the Property, the proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. In the event of a partial taking of the Property in which the fair market value of the Property immediately before the taking is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the taking, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the taking, divided by (b) the fair market value of the Property immediately before the taking. Any balance shall be paid to Borrower. In the event of a partial taking of the Property in which the fair market value of the Property immediately before the taking is less than the amount of the sums secured immediately before the taking, unless Borrower and Lender otherwise agree in writing or unless applicable law otherwise provides, the proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the condemnor offers to make an award or settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the proceeds, at its option, either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of such payments.

11. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to any successor in interest of Borrower shall not operate to release the liability of the original Borrower or Borrower's successors in interest. Lender shall not be required to commence proceedings against any successor in interest or refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or Borrower's successors in interest. Any forbearance by Lender in exercising any right or remedy shall not be a waiver of or preclude the exercise of any right or remedy.

12. Successors and Assigns Bound; Joint and Several Liability; Co-signers. The covenants and agreements of this Security Instrument shall bind and benefit the successors and assigns of Lender and Borrower, subject to the provisions of paragraph 17. Borrower's covenants and agreements shall be joint and several. Any Borrower who co-signs this Security Instrument but does not execute the Note: (a) is co-signing this Security Instrument only to mortgage, grant and convey that Borrower's interest in the Property under the terms of this Security Instrument: (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower may agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without that Borrower's consent.

13. Loan Charges. If the loan secured by this Security Instrument is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge under the Note.

14. Notices. Any notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice shall be directed to the Property Address or any other address Borrower designates by notice to Lender. Any notice to Lender shall be given by first class mail to Lender's address stated herein or any other address Lender designates by notice to Borrower. Any notice provided for in this Security Instrument shall be deemed to have been given to Borrower or Lender when given as provided in this paragraph.

15. Governing Law; Severability. This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. In the event that any provision or clause of this Security Instrument or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision. To this end the provisions of this Security Instrument and the Note are declared to be severable.

16. Borrower's Copy. Borrower shall be given one conformed copy of the Note and of this Security Instrument.

Form 3006  9/90

17. **Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

18. **Borrower's Right to Reinstate.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earlier of: (a) 5 days (or such other period as applicable law may specify for reinstatement) before sale of the Property pursuant to any power of sale contained in this Security Instrument; or (b) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees; and (d) takes such action as Lender may reasonably require to assure that the lien of this Security Instrument, Lender's rights in the Property and Borrower's obligation to pay the sums secured by this Security Instrument shall continue unchanged. Upon reinstatement by Borrower, this Security Instrument and the obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under paragraph 17.

19. **Sale of Note; Change of Loan Servicer.** The Note or a partial interest in the Note (together with this Security Instrument) may be sold one or more times without prior notice to Borrower. A sale may result in a change in the entity (known as the "Loan Servicer") that collects monthly payments due under the Note and this Security Instrument. There also may be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change in accordance with paragraph 14 above and applicable law. The notice will state the name and address of the new Loan Servicer and the address to which payments should be made. The notice will also contain any other information required by applicable law.

20. **Hazardous Substances.** Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property that is in violation of any Environmental Law. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property.

Borrower shall promptly give Lender written notice of any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge. If Borrower learns, or is notified by any governmental or regulatory authority, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law.

As used in this paragraph 20, "Hazardous Substances" are those substances defined as toxic or hazardous substances by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. As used in this paragraph 20, "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

21. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under paragraph 17 unless applicable law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender, at its option, may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by applicable law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this paragraph 21, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by applicable law to Borrower and to the other persons prescribed by applicable law. Trustee shall give public notice of sale to the persons and in the manner prescribed by applicable law. After the time required by applicable law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Page 6 of 8

Form 3005 9/90

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

22. Reconveyance. Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty and without charge to the person or persons legally entitled to it. Such person or persons shall pay any recordation costs.

23. Substitute Trustee. Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by applicable law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

24. Request for Notices. Borrower requests that copies of the notices of default and sale be sent to Borrower's address which is the Property Address.

25. Statement of Obligation Fee. Lender may collect a fee not to exceed the maximum amount permitted by law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

26. Riders to this Security Instrument. If one or more riders are executed by Borrower and recorded together with this Security Instrument, the covenants and agreements of each such rider shall be incorporated into and shall amend and supplement the covenants and agreements of this Security Instrument as if the rider(s) were a part of this Security Instrument. [Check applicable box(es)]

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] 1-4 Family Rider |
| [ ] Graduated Payment Rider | [ ] Planned Unit Development Rider | [ ] Biweekly Payment Rider |
| [ ] Balloon Rider | [ ] Rate Improvement Rider | [X] Second Home Rider |
| [ ] V.A. Rider | [ ] Other(s) [specify] | |

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any rider(s) executed by Borrower and recorded with it.
Witnesses:

_____     _____ (Seal)
                                              NANCY BERMAN                    -Borrower
                                     Social Security Number _____-9465

_____     _____ (Seal)
                                                                             -Borrower
                                     Social Security Number

_____ (Seal)   _____ (Seal)
                                   -Borrower                               -Borrower
BRUCE BERMAN                         Social Security Number
Social Security Number _____-9308   County ss:
State of California,
     On this         day of          , before me, the undersigned, a Notary Public
in and for said State, personally appeared

known to me, or proved to me on the basis of satisfactory evidence to be the person(s) whose name(s)      subscribed
to the foregoing instrument and acknowledged that                          executed the same.
     Witness my hand and official seal.
(Reserved for official seal)                 Signature_____

mR

                                             _____
                                             Name (typed or printed)
                                             My Commission Expires:

          effective Jan. '42
          all purpose forms
          to be used only.

**ALL-PURPOSE ACKNOWLEDGMENT**

NO 200

State of CALIFORNIA

County of LOS ANGELES

On Jan 16 1992 before me, Monica Ramos
DATE                                NAME, TITLE OF OFFICER · E.G., "JANE DOE, NOTARY PUBLIC"

personally appeared BRUCE BERMAN and NANCY BERMAN
NAME(S) OF SIGNER(S)

☒ personally known to me - OR - ☐ proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

Witness my hand and official seal.

OFFICIAL SEAL
MONICA RAMOS
Notary Public-California
LOS ANGELES COUNTY
My Commission Expires
August 3, 1993

SIGNATURE OF NOTARY

**CAPACITY CLAIMED BY SIGNER**

☒ INDIVIDUAL(S)
☐ CORPORATE
   OFFICER(S) _____
                        TITLE(S)
☐ PARTNER(S)
☐ ATTORNEY-IN-FACT
☐ TRUSTEE(S)
☐ SUBSCRIBING WITNESS
☐ GUARDIAN/CONSERVATOR
☐ OTHER: _____

SIGNER IS REPRESENTING:
NAME OF PERSON(S) OR ENTITY(IES)

ATTENTION NOTARY: Although the information requested below is OPTIONAL, it could prevent fraudulent attachment of this certificate to unauthorized document.

| THIS CERTIFICATE MUST BE ATTACHED TO THE DOCUMENT DESCRIBED AT RIGHT: | |
|---|---|
| Title or Type of Document DEED OF TRUST | |
| Number of Pages 1 | Date of Document Jan 8, 1992 |
| Signer(s) Other Than Named Above None | |

© 1991 NATIONAL NOTARY ASSOCIATION · 8236 Remmet Ave. · P.O. Box 7184 · Canoga Park, CA 91304-7184

# SECOND HOME RIDER

THIS SECOND HOME RIDER is made on this 9TH day of JANUARY 1992 and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower," whether there are one or more persons undersigned) to secure Borrower's Note to

Crossland Savings, FSB

(the "Lender")
of the same date and covering the property described in the Security Instrument (the "Property"), which is located at: 1355 EAST MOUNTAIN DRIVE

SANTA BARBARA, CA 93108

[Property Address]

In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree that Uniform Covenant 6 of the Security Instrument is deleted and is replaced by the following:

6. Occupancy and Use; Preservation, Maintenance and Protection of the Property; Borrower's Loan Application; Leaseholds. Borrower shall occupy, and shall only use, the Property as Borrower's second home. Borrower shall keep the Property available for Borrower's exclusive use and enjoyment at all times, and shall not subject the Property to any timesharing or other shared ownership arrangement or to any rental pool or agreement that requires Borrower either to rent the Property or give a management firm or any other person any control over the occupancy or use of the Property. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate, or commit waste on the Property. Borrower shall be in default if any forfeiture action or proceeding, whether civil or criminal, is begun that in Lender's good faith judgment could result in forfeiture of the Property or otherwise materially impair the lien created by this Security Instrument or Lender's security interest. Borrower may cure such a default and reinstate, as provided in paragraph 18, by causing the action or proceeding to be dismissed with a ruling that, in Lender's good faith determination, precludes forfeiture of the Borrower's interest in the Property or other material impairment of the lien created by this Security Instrument or Lender's security interest. Borrower shall also be in default if Borrower, during the loan application process, gave materially false or inaccurate information or statements to Lender (or failed to provide Lender with any material information) in connection with the loan evidenced by the Note, including, but not limited to, representations concerning Borrower's occupancy and use of the Property as a second home. If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this Second Home Rider.

_____ (Seal)          _____ (Seal)
BRUCE BERMAN          -Borrower                                            -Borrower

_____ (Seal)          _____ (Seal)
NANCY BERMAN          -Borrower                                            -Borrower

MULTISTATE SECOND HOME RIDER - Single Family - Freddie Mac UNIFORM INSTRUMENT          Form 3890 9/90
-385 (8102)          VMP MORTGAGE FORMS - (313)293-8100 - (800)521-7291

# ADJUSTABLE RATE RIDER

LOAN #: 1666163

THIS ADJUSTABLE RATE RIDER is made this 8TH day of JANUARY, 19 92 and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to CrossLand Savings, FSB
(the "Lender") of the same date and covering the property described in the Security Instrument and located at:

1355 EAST MOUNTAIN DRIVE                    SANTA BARBARA, CA 93108
                              (Property Address)

> THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES
> IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE
> NOTE LIMITS THE AMOUNT THE BORROWER'S INTEREST
> RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM
> RATE THE BORROWER MUST PAY.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

## A. INTEREST RATE AND MONTHLY PAYMENT CHANGES

The Note provides for an initial interest rate of 6.500 %. Section four of the Note provides for changes in the interest rate and the monthly payments, as follows:

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The interest rate I will pay may change on the first day of FEBRUARY, 19 93, and on that day every 12 months thereafter. Each date on which my interest rate could change is called a "Change Date".

### (B) The Index

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the weekly average yield on United States Treasury Securities adjusted to a constant maturity of one year, as made available by the Federal Reserve Board.

The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index".

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

### (C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding THREE percentage points ( 3.000 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the maturity date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

### (D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than 8.500 % or less than 6.500 %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than TWO AND NO /100 percentage points ( 2.000 %) from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than 12.500 %.

### (E) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any questions I may have regarding the notice.

## B.   TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER.

Uniform Covenant 17 of the Security Instrument is amended to read as follows:

**Transfer of the property or a beneficial interest in Borrower.** If all of any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by applicable law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ (Seal)
BRUCE BERMAN                    -Borrower

_____ (Seal)
NANCY BERMAN                    -Borrower

_____ (Seal)
                                -Borrower

_____ (Seal)
                                -Borrower

This is a true certified copy of the original document on file or of record in my office. It bears the seal and signature, imprinted in purple ink of the County Clerk, Recorder and Assessor.

COUNTY CLERK, RECORDER AND ASSESSOR, SANTA BARBARA CALIFORNIA
DATE MAR 1 0 2014 _____ BY DEPUTY _____

# EXHIBIT D

# EXHIBIT D

# EXHIBIT D

**EXPERT'S REPORT**

**ON THE**

**DOCUMENT EXAMINATION**

**of the**

**Questioned 'Grant Deed'**

**For Randy & Evgenia Quaid**

By:

Douglas A. Cobb

April 2, 2021

PAPER FORENSICS

GRANT DEED QUESTIONED DOCUMENT EXAMINATION                                         APRIL 2021

## 1.   INTRODUCTION & SCOPE OF WORK

This report was prepared in connection with a questioned signature on a Grant Deed dated November 11, 1991. The dispute is whether the signature of Randall R. Quaid is genuine and authored by Mr. Quaid, or if it was authored by someone else. In addition, I will examine the questioned document of any other discrepancies or anomalies.

I was retained to examine the document and give an opinion as to the authenticity of Randy R. Quaid's signature present on the questioned document, 'Grant Deed' dated November 11, 1991. In addition, to determine if there are other discrepancies within the questioned document that would point towards possible modification or fabrication. The questioned document, along with exemplars of Randy Quaid's known signature, was emailed to me, then examined at my office located in Richmond Hill, GA.

## 2.   AVAILABLE INFORMATION

The list of documents below contain "Known" documents designated with a [K1-K16] and "Questioned" (Grant Deed) document designated with a [Q1]. All of the documents listed contained the signature of Randy Quaid.

*Documents Available for Examination:*

2.1    [K1] Color scan of a stock statement dated 5-28-1981 containing Randy Quid's signature.
2.2    [K2] Photocopy of a Warner Bros Agreement containing Randy Quid's signature.
2.3    [K3] Color image of the original 1998 Corporate Tax Statement.
2.4    [K4] Color image of the original Bees 'N Honey Agreement, Signature 1.
2.5    [K5] Color image of the original Bees 'N Honey Agreement, Signature 2.
2.6    [K6] Color image of the original Bees 'N Honey Agreement, Signature 3.
2.7    [K7] Photocopy of a July 3, 1990 Carsey-Werner Company Agreement.
2.8    [K8] Photocopy of September 14, 1990 Certificate of Amendment of Articles of Incorporation.
2.9    [K9] Color image of the original 1991 Certificate of Amendment of Articles of Incorporation.
2.10   [K10] Color image of the original signature on original application form.
2.11   [K11] Photocopy of 1994 Work Authorization to work in Canada.
2.12   [K12] Photocopy of a 1995 Film Contract containing "title" and Randy Quid's signature.
2.13   [K13] Photocopy of a 1995 Film Contract containing "Artist" and Randy Quid's signature.
2.14   [K14] Color image of original June 1995 Request for Files letter.
2.15   [K15] Color image of the original 2009 Passport Application.
2.16   [K16] Photocopy of 2009 Passport.
2.17   [Q1] Photocopy of the Grant Deed dated November 11, 1991 containing the questioned signature of Randall R. Quaid.

## 3.   THE DOCUMENTS AND WRITINGS INVOLVED IN THIS EXAMINATION

The known document sets contain a combination of scanned images of original documents with "wet ink" signatures along with some photocopies. The questioned document is a certified photocopy from the Santa Barbara County Clerk, Recorder and Assessor.

## 4.   METHODOLOGY

I am a Paper Scientist and Forensic Document Examiner, I have been involved in the research, development, production and testing of various grades of paper for over 27 years.  I have been involved in the development of testing of paper and print characteristics for Hewlett Packard, Xerox, Cannon, Deluxe Check and other companies which are major suppliers of high-quality copy paper and office

PAPER FORENSICS

equipment. I consult and assist Handwriting Experts and Forensic Document Examiners with examinations related to paper and paper properties. I have presented at many national and international conferences, educating Handwriting Experts and Forensic Document Examiners in the aspects of paper and print properties and how they present clues to forensic analysis.

I have been a Forensic Document Examiner for 13 years. In my forensic document analysis methodology, I follow and abide by the standards developed by professionals in the Forensic Document Examination discipline and guidelines published by the Scientific Association of Forensic Examiners (SAFE). These standards and guidelines have been thoroughly studied through extensive scientific research and validated through rigorous peer review and publication. I've applied the standards and guidelines that are applicable to the document examined in this case.

The signatures were prepared for examination by cropping them from the documents and labeled with their date and origin if known.

**5.   ANALYSIS AND DISCUSSION**

I examined the "Questioned" signature on the document titled, "Grant Deed" along with sixteen samples of "Known" signatures of Randy Quaid.

Examination of the K1-K16 "Known" Signatures of Randy Quaid revealed the following:
1. The signatures supplied are both original "wet ink" and machine copies.
2. The signatures submitted exhibit a limited/normal range of variation.
3. The signature characters are not completely legible, some characters are not clearly defined.
4. Pen speed is rapid, natural and consistent.
5. Rhythm is natural, smooth and consistent.
6. The signatures exhibit little to no slant, they are signed along the signature line.
7. Height ratios of lower-case are even.
8. The heights of lower-case extenders (d) is comparable with respect to the upper-case characters.
9. Spacing of characters are tight and even.
10. Spacing of first and last name is contiguous in all but two of the samples.
11. Curvatures are smooth and without tremor.
12. The dates of the signatures range from 1981 to 2009.

Examination of the Q1 "Questioned" signature of Randy Quaid revealed the following:
1. The signature is a copy and not "wet ink".
2. Signature is signed as Randall rather than Randy.
3. The signature exhibits an abnormal range of variation.
4. The signature characters are not clearly defined, and some letters are missing.
5. Pen speed is consistent through most of the signature.
6. Rhythm is smooth except for the pen lift between the last "l" in Randall and the "R" but limited to the document being a photocopy.
7. There is a moderate upward slant in the first name Randall.
8. There is a significant downward slant in the middle initial R and last name Quaid.
9. There is an overall downward slant to the entire signature.
10. The height ratios of the capital letters are inconsistent.
11. Spacing of characters is inconsistent.
12. Curvatures are smooth.

PAPER FORENSICS

GRANT DEED QUESTIONED DOCUMENT EXAMINATION                              APRIL 2021

**K11 – 1994 Empoyment Authorization Form**



**K12 – 1995 Film Contract "Title" Signature**



**K13 – 1995 Film Contract "Artist" Signature**



**K14 – June 1995 Request for Files**



**K15 – 2009 Passport Application**



**K16 – 2009 Passport**



Q1 – Questioned Signature

GRANT DEED QUESTIONED DOCUMENT EXAMINATION                                        APRIL 2021

**6.   EXEMPLARS OF 16 "KNOWN" AND ONE "QUESTIONED SIGNATURE OF RANDY QUAID**

K1 – 5-28-1981 Stock Statement



K2 - Warner Bros Agreement



K3 – 1988 Corporate Tax Form



K4 – 1988 Bees 'N Honey Agree. Sign. 1



K5 – 1988 Bees 'N Honey Agreement Sign. 2



K6 - 1988 Bees 'N Honey - Sign. 3



K7 – July 3, 1990



K8 – Sept. 1990 Certificate of Aendment



K9 – 1-29-1991 Certificate of Amendment



K10 - 1991 Signature on Application Form



<u>Analysis of the K1-K16 "Known" and Q1, "Questioned" Signatures:</u>

*Findings of the "Known" signatures:*
1. All "Known" signatures are horizontal, without slant and follow the signature line.
2. The "R" in Randy either touches or extends below the signature line, as indicated by the red arrows labeled 2 on the exemplars.
3. The outer portion of the loop in "d" is formed first, then the inner portion of the loop with a downward stroke. See Figure 1 below.
4. There is a unique upward stroke formed after the large loop, in place of the lower round portion of the "d", as indicated by the green arrows labeled 4 on the exemplars.
5. In all but two of the sixteen "Known" examples, the entire first and last name are contiguous or formed without a pen lift.

*Findings of the "Questioned" signature:*
1. There is an overall downward to the right slant to the signature.
2. The first name has an upward slope or slant (1). See Figure 4 below.
3. The middle initial and last name have a downward slope of slant (2). See Figure 4 below.
4. The initial downstroke in the first letter R does not meet the signature line. See Figure 4 below.
5. The only characters present in the last name are the "Q" and "d".
6. The loop in the "d" in Quaid is formed opposite to the "Known" examples, the inner portion of the loop, then the outer portion. See Figures 2 and 3 below.
7. The unique ending stroke of the "d" points downward instead of upward in all of the "Known" samples. See Figures 2 and 3 below.

<u>The Formation of the Letter "d" in Quaid:</u>

*Known Signature:*
This differs from the "Known" samples, as shown in the, (K3) Figure 1, example below. In all of the "Known" samples the "d" in Quaid is formed by an upstroke forming the outer loop (1), then the downward stoke (2) then the small upward line (3), which is a unique characteristic of Randy's signature.



*Figure 1, Known signature example of Randy Quaid.*

GRANT DEED QUESTIONED DOCUMENT EXAMINATION                                              APRIL 2021

*Questioned Signature:*

Formation of the letter "d" in Quaid. There are no letters between what I believe is a Q and d. The "d" is formed by a downward stroke (1) transitioning from the Q, then the upward stoke (2) is the inside vertical of the loop, followed by the outer portion of the loop (3) then the upward stroke (4) and finally the stoke to the left and downward (5). See Figures 1 and 2 below.



*Figure 2, Questioned signature of Randall R. Quaid.*



*Figure 3, Questioned signature of Randall R. Quaid.*

Slants within the Questioned Signature:



*Figure 4, Questioned signature of Randall R. Quaid.*

7

PAPER FORENSICS

There is an upward slant to the letters of the first name (Randall) (1), then a downward slant to the middle initial (R) and the last name (Quaid) (2). There is also an overall downward slope the entire signature. This is inconsistent with the "Known" sample signatures (3). See Figure 4 above.

In addition, the signature is non-contiguous as there is a pen lift between the last "l" in Randall and the "R" in R.

**7.   EXAMINATION OF THE 'GRANT DEED'**

Observations or anomalies within the 'Grant Deed' document: See Exhibit A attached to the report.

- The document was written for Randall R. Quaid, not Randy Quaid. Mr. Quaid utilizes Randy Quaid as his legal name on documents including passports, movie contracts, the work authorization to work in Canada, and corporate legal documents.
- Evgenia is misspelled as Eugenia.
- The manner in which the Notary's name is written is suspicious, much of the bottom portion of her characters  appear to be flat, similar to being on a line or written with a straight edge. Examination of the original document is recommended to confirm if the Notary's name is a genuine wet-ink signature and not a "copy & paste".

**8.   BASIS OF OPINION**

The basis for handwriting identification is that writing habits are not instinctive or hereditary but are complex processes that are developed gradually through habit and that handwriting is unique to each individual. Furthermore, the basic axiom is that no one person writes exactly the same way twice and no two people write exactly the same. Thus, writing habits or individual characteristics distinguish on person's handwriting from another.

A process of analysis, comparison and evaluation is conducted between the known/genuine standards and questioned documents. In order to establish that handwriting was or was not written by a particular person, an examination with known/genuine signatures must show substantial agreement in sufficient handwriting characteristics to identify the maker and eliminate the possibility of another writer. The handwriting characteristics that are evaluated include line quality, pressure patterns, rhythm, slant, size and proportions, utilization of space and spatial alignment, initial and terminal strokes, writing speed, legibility, skill level, letter forms, types of connectors, method of construction, and pattern formation.

Sufficient similarities between the questioned handwriting and the exemplars help to make an identification of a writer. Any significant unexplainable fundamental difference will be sufficient to eliminate the writer.

Based on the conclusions of the expert, an opinion will be expressed. The opinions are derived from the **S**cientific **A**ssociation of **F**orensic **E**xaminers (**SAFE**) Standards: Guide for Expressing and Reporting Opinions for Handwriting Examination.

**9.   OPINION**

Based on the documents submitted and within the bounds of reasonable scientific certainty, and subject to change if additional information becomes available, it is my professional opinion that:

8

GRANT DEED QUESTIONED DOCUMENT EXAMINATION                                          APRIL 2021

9.1   There are several noted characteristics and significant inconsistencies between the Q1 'Grant Deed' disputed Randall R. Quaid signature and the K1-K16 known handwriting exemplars of Randy Quaid. It is my professional opinion that it is **strong probability** the author of the known signatures of 'Randy Quaid' on the 'K1-K16' documents **did not author** the questioned signature of 'Randall R. Quaid' on the Q1 document.

9.2   In addition, to the questioned signature of Mr. Quaid, the authenticity of the Q1 'Grant Deed' is questionable due to the misspelling of Evgenia's name throughout the document and the questionable traits in the Notary's signature.

Douglas Cobb
Court Qualified & Certified
Paper Scientist & Forensic Paper Examiner

PAPER FORENSICS

**Exhibit A**

# STATE OF CALIFORNIA
# DEPARTMENT OF REAL ESTATE

In reviewing a licensee�s information, please be aware that license discipline information may have been removed from a licensee�s record pursuant to Business & Professions Code Section 10083.2 (c). However, discipline information may be available from the California Department of Real Estate upon submittal of a request, or by calling the Department�s public information line at 1-877-373-4542. The license information shown below represents public information. It will not reflect pending licensing changes which are being reviewed for subsequent updating. Although the business and mailing addresses of real estate licensees are included, this information is not intended for mass mailing purposes.

Some historical disciplinary action documents may not be in compliance with certain accessibility functions. For assistance with these documents, please contact the Department's Licensing Flag Section.

License information taken from records of the Department of Real Estate on 4/7/2021 6:33:37 AM

| | |
|---|---|
| **License Type:** | CORPORATION |
| **Name:** | SMS Trust Deed Service |
| **Mailing Address:** | 3160 AIRWAY AVENUE<br>COSTA MESA, CA 92626 |
| **License ID:** | 00865309 |
| **Expiration Date:** | 05/21/88 |
| **License Status:** | EXPIRED |

Corporation License Issued: 05/22/84 (Unofficial -- taken from secondary records)

| | |
|---|---|
| **Former Name(s):** | NO FORMER NAMES |
| **Main Office:** | NO CURRENT MAIN OFFICE ADDRESS ON FILE |
| **Licensed Officer(s):** | DESIGNATED OFFICER<br>00658190 - Expiration Date: 05/21/88<br>Hunter, David C<br>OFFICER LICENSE EXPIRED AS OF 05/22/88<br><br>00640820 - Expiration Date: 05/21/88<br>Young, Judith Lucille<br>OFFICER LICENSE EXPIRED AS OF 05/22/88 |
| **DBA** | SMS Mortgage Servicing<br>ACTIVE FROM 05/22/1984 TO 08/09/1985<br><br>NO CURRENT DBAS |
| **Branches:** | NO CURRENT BRANCHES |
| **Comment:** | NO DISCIPLINARY ACTION<br><br>NO OTHER PUBLIC COMMENTS |

## The CV of DOUGLAS COBB
## Paper Scientist and Forensic Document Examiner

Paper Scientist and Legal Document Expert who "understands the science of paper" and brings a unique skillset to forensic document examination. Twenty-nine years as a paper scientist and fourteen years as a paper scientist and a forensic examiner. Experienced in the development of paper grades for Hewlett Packard, Xerox, Cannon, McDonald's, Deluxe Check and other companies. Broad experience in the support, and training of forensic document examiners and other scientists about paper characteristics and security features that include fraudulent deeds, wills, business contracts/agreements and medical records. Additional expertise in surface and colloid chemistry, water chemistry, sizing, retention and fillers. Experience with many types of paper machines; including fourdrinier, twin-wire, gap formers, Yankee, TAD, cylinder and Duo-Formers, on-machine and off-machine coaters with blade and curtain coater technologies, manufacture and development of paper grades, including, printing and writing, coated and uncoated free-sheet, packaging, bleach board, food-grade, saturating kraft and tissue.

**PROFESSIONAL EXPERIENCE**

2016 to
Present
**Paper Forensics,**
*Founder and CEO*
Provide technical investigations, analysis, reports and testimony toward the resolution and litigation related to disputed documents or signatures to include wills, trusts, checks, contracts, deeds, mortgage documents, medical records, prenuptial agreements, voter registration forms and ballot cards. Investigation and analysis that includes substituted documents, dating paper, suspect documents, electronic documents, identity theft, alterations, and altered medical records or forms. Development of new science-based technologies, ScanRite Paper ID Technologies and SecureDoc5, to minimize or eliminate document fraud and improve document security. Train other forensic practitioners and scientists on the importance of paper characteristics and their impact on document forensics.

2019 to
2020
**Robson Forensic**
*Independent Contractor*
Provide technical investigations, analysis, reports and testimony toward the resolution and litigation related to disputed documents or signatures to include wills, trusts, checks, contracts, deeds, mortgage documents, medical records, prenuptial agreements, voter registration forms and ballot cards. Investigation and analysis include questioned signatures, substituted documents, dating paper, suspect documents, electronic documents, identity theft, alterations, and altered medical records or forms. Development of new science-based technologies to minimize or eliminate document fraud and improve document security. Train other forensic practitioners and scientists on the importance of paper characteristics and their impact on document forensics.

2015 to
Present
**Callahan Industries**
*Account Manager – Richmond Hill, GA*
Responsible for account management for the Southeast Atlantic Coastal Territory, covering approximately forty-five paper mills, including fourdrinier, twin-wire, gap former, TAD, Yankee, cylinder and molded pulp machines.
- Responsible for directing all consulting efforts and technical training for the production, engineering, electrical and instrumentation and technical groups within the mills.
- Coordinate all installation, service and technical activities by providing technical service, sales support, installation guides and E&I training.

- Provide technical advice in areas of consistency control, freeness control, kappa, brightness, fiber morphology and advanced process control.

**2008 to 2017**

**Paper Private Eye**
*Partner*
Provided consulting and educational services to attorneys, document examiners and handwriting experts related to paper and paper properties. Assist clients with forensic analysis, reports and testimony toward the resolution and litigation related to disputed documents that include wills, trusts, checks, contracts, deeds and mortgage documents.

**2010 to 2015**

**Solenis LLC**
*Sr. Territory Leader, Sr. Site Manager and Technical Sales  2008-2016 and 1996-2005*
Managed the chemical sales and technical service for multiple paper mills in several states.
- Provided technical improvements in pulp and paper processes and water chemistry through expertise in wet-end and surface-colloid chemistry and knowing their impact on paper properties and printing performance
- Extensive experience in wet-strength, dry strength, sizing, retention aids, flocculants, defoamers, softener, debonder and coating chemistries.
- Responsible for directing all sales efforts with production, engineering, electrical & instrumentation and technical groups within the mills.
- Provided process technical direction and instruction to mills in the areas of retention and wet-end chemical optimization, strength and fiber development, print performance and cost reduction.
- Assisted mills with the development of new food-grade, packaging, pulp and printer paper grades, including 100% Surface Size within Boise Cascade.

**2005 to 2008**

*Senior Plant Engineer*                                                                 *2005-2008*
*Sr.Engineer – Louisiana, MO*
- Project Manager for $25 million expansion of Synlubes synthetic lubrication plant, managed the construction contractor, oversaw construction, selection and installation of equipment.
- Assisted with the development and scale-up of a new process and DCS control system that included writing several process procedures and operating manuals.
- Provided process engineering and technical services for the manufacture of formaldehyde, fertilizer, pentaerythritol and synthetic lubricants.
- Assisted and management of Synlubes Plant operators.
- Utilized chemical engineering methodologies to solve quality issues with products manufactured in the plant. These methodologies included identifying the relationship between the cooling temperature and lime addition during the acid neutralization process that subsequently resolved the long-time issue of excess residual acid in the synthetic lubricant that is used in most commercial airplanes that is supplied to AirBP, the aeronautical division of British Petroleum.

**1993 to 1996**

**Boise Cascade Corporation**
*Process and Production Engineer & Product Development*
Held positions of process and production engineering positions at the International Falls, MN Mill for four paper machines producing nearly 3000 tons of paper per day.
- Assisted with Xerox and Hewlett Packard development, production and qualification of printing and writing grades utilizing Design of Experiments that included paper

2

testing and the implementation of customer specification verification through statistical process controls.
- Developed barrier coatings, including oil and grease resistance of food packaging grades for the International Falls, Minnesota and Vancouver, Washington Paper Mills. Customers included McDonalds.
- Developed security paper grades for Deluxe Check.

**EDUCATION**

B.S. Forest Products, Specialization in Paper Science and Engineering, University of Minnesota, Saint Paul, Minnesota, 1993

Associate Degree,  Service Electronics, Willmar Vocational-Technical Institute, Willmar, Minnesota, 1979

*Continuing education:*
SAFE, Scientific Association of Forensic Examiners, 2019-Present, month training.
AHWT Leadership Training, Jacksonville, FL, 2008
Consultative Selling, Wilmington, DE, 2007
ISO 9001 Internal Auditing, 2006
Situational Sales Negotiation, Jacksonville, FL, 2006
Kepner-Tregoe Project Management, Wilmington, DE, 2002
Zenger Miller, Self-directed Work Team Training, Biloxi, MS, 1999
Kepner-Tregoe Problem Solving & Decision Making, International Falls, MN, 1996
Entec Process Dynamics & Control, International Falls, MN, 1995
Clariant Paper Color School, Charlotte, NC, 1995
QualPro Statistical Methods, International Fall, MN, 1994

**PROFESSIONAL MEMBERSHIPS**

SAFE, Scientific Association of Forensic Examiners
ACFE, Association of Certified Forensic Examiner

**PUBLICATIONS**

Cobb, D., The Color Spectrophotometer and the Examination of Questioned Documents, NADE Annual Journal, 2019
Cobb, D., Variability Within Purchased Wood Chips, Minnesota Academy of Science Journal, 1993

**TESTIMONY & DEPOSITIONS**

*Testimony*
Heritage Capital Group, Inc. vs Former US Blades, LLC, Case No. 16-2019-CA-522, Circuit Court of 4th Judicial Circuit, Duval Co. FL, August 2020

Valerie Zamberletti vs Maria E. Amplatz, Case No. 27-CV-20-5136, District Court, 4th Judicial District, State of Minnesota, County of Hennepin, February 2021

*Deposition*
John Mark Wilhite vs No. 57216, Division B Patti Sue Wilhite, Monroe, LA, January 2021

Sharon Ramsey (Mary Pettway) vs Birmingham Nursing & Rehabilitation Center, February 2021

# EXHIBIT E

# EXHIBIT E

# EXHIBIT E

# EXHIBIT F

# EXHIBIT F

# EXHIBIT F

# EXHIBIT G

# EXHIBIT G

# EXHIBIT G

# HOMEOWNER'S POLICY OF TITLE INSURANCE ONE-TO-FOUR FAMILY RESIDENCE

## Issued by Lawyers Title Insurance Corporation

 LandAmerica Lawyers Title

*Lawyers Title Insurance Corporation is a member of the LandAmerica family of title insurance underwriters.*

**POLICY NUMBER**

**04101724**

### OWNER'S INFORMATION SHEET

Your Title Insurance Policy is a legal contract between You and Us.

It applies only to a one-to-four family residence and only if each insured named in Schedule A is a Natural Person. If the Land described in Schedule A of the Policy is not an improved residential lot on which there is located a one-to-four family residence, or if each insured named in Schedule A is not a Natural Person, contact Us immediately.

The Policy insures You against actual loss resulting from certain Covered Risks. These Covered Risks are listed beginning on page 2 of the Policy. The Policy is limited by:

* Provisions of Schedule A
* Exceptions in Schedule B
* Our Duty To Defend Against Legal Actions on page 2
* Exclusions on page 3
* Conditions on pages 3 and 4.

You should keep the Policy even if You transfer Your Title to the Land.

If You want to make a claim, see paragraph 3 under Conditions on page 3.

You do not owe any more premiums for the Policy.

This sheet is not Your insurance Policy. It is only a brief outline of some of the important Policy features. The Policy explains in detail Your rights and obligations and Our rights and obligations. Since the Policy – and not this sheet – is the legal document,

### YOU SHOULD READ THE POLICY VERY CAREFULLY.

If You have any questions about Your Policy, contact:

Consumer Affairs Department
Lawyers Title Insurance Corporation
P.O. Box 27567
Richmond, Virginia 23261-7567

### TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| OWNER'S COVERAGE STATEMENT | | 2 |
| COVERED RISKS | | 2 |
| OUR DUTY TO DEFEND AGAINST LEGAL ACTIONS | | 2 |
| SCHEDULE A | | Insert |
| | Policy Number, Premium, Date and Amount Deductible Amounts and Maximum Dollar Limits of Liability | |
| | Street Address of the Land | |
| 1. | Name of Insured | |
| 2. | Interest in Land Covered | |
| 3. | Description of the Land | |
| SCHEDULE B – EXCEPTIONS | | Insert |
| EXCLUSIONS | | 3 |
| CONDITIONS | | 3 |
| 1. | Definitions | 3 |
| 2. | Continuation of Coverage | 3 |
| 3. | How to Make a Claim | 3 |
| 4. | Our Choices When We Learn of a Claim | 3 |
| 5. | Handling a Claim or Legal Action | 4 |
| 6. | Limitation of Our Liability | 4 |
| 7. | Transfer of Your Rights to Us | 4 |
| 8. | Entire Contract | 4 |
| 9. | Increased Policy Amount | 4 |
| 10. | Severability | 4 |
| 11. | Arbitration | 4 |

## OWNER'S COVERAGE STATEMENT

This Policy insures You against actual loss, including any costs, attorneys' fees and expenses provided under this Policy, resulting from the Covered Risks set forth below, if the Land is an improved residential lot on which there is located a one-to-four family residence and each insured named in Schedule A is a Natural Person.

Your insurance is effective on the Policy Date. This Policy covers Your actual loss from any risk described under Covered Risks if the event creating the risk exists on the Policy Date or, to the extent expressly stated, after the Policy Date.

Your insurance is limited by all of the following:

- The Policy Amount shown in Schedule A
- For Covered Risk 14, 15, 16, and 18, Your Deductible Amount and Our Maximum Dollar Limit of Liability shown in Schedule A
- Exceptions in Schedule B

- Our Duty To Defend Against Legal Actions
- Exclusions on page 3
- Conditions on pages 3 and 4.

## COVERED RISKS

The Covered Risks are:

1. Someone else owns an interest in Your Title.
2. Someone else has rights affecting Your Title arising out of leases, contracts, or options.
3. Someone else claims to have rights affecting Your Title arising out of forgery or impersonation.
4. Someone else has an easement on the Land.
5. Someone else has a right to limit Your use of the Land.
6. Your Title is defective.
7. Any of Covered Risks 1 through 6 occurring after the Policy Date.
8. Someone else has a lien on Your Title, including a:
   a. Mortgage;
   b. judgment, state or federal tax lien, or special assessment;
   c. charge by a homeowner's or condominium association; or
   d. lien, occurring before or after the Policy Date, for labor and material furnished before the Policy Date.
9. Someone else has an encumbrance on Your Title.
10. Someone else claims to have rights affecting Your Title arising out of fraud, duress, incompetency or incapacity.
11. You do not have both actual vehicular and pedestrian access to and from the Land, based upon a legal right.
12. You are forced to correct or remove an existing violation of any covenant, condition or restriction affecting the Land, even if the covenant, condition or restriction is excepted in Schedule B. However, You are not covered for any violation that relates to any obligation to perform maintenance or repair on the Land, or relates to environmental protection of any kind or nature, including hazardous or toxic conditions or substances, unless notice of the violation is recorded in the Public Records.
13. Your Title is lost or taken because of a violation of any covenant, condition or restriction, which occurred before You acquired Your Title, even if the covenant, condition or restriction is excepted in Schedule B.
14. Because of an existing violation of a subdivision law or regulation affecting the Land:
    a. You are unable to obtain a building permit;
    b. You are forced to correct or remove the violation; or
    c. someone else has a legal right to, and does, refuse to perform a contract to purchase the Land, lease it or make a Mortgage loan on it.
    The amount of Your insurance for this Covered Risk is subject to Your Deductible Amount and Our Maximum Dollar Limit of Liability shown in Schedule A.
15. You are forced to remove or remedy Your existing structures, or any part of them - other than boundary walls or fences - because any portion was built without obtaining a building permit from the proper government office. The amount of Your insurance for this Covered

Risk is subject to Your Deductible Amount and Our Maximum Dollar Limit of Liability shown in Schedule A.
16. You are forced to remove or remedy Your existing structures, or any part of them, because they violate an existing zoning law or zoning regulation. If You are required to remedy any portion of Your existing structures, the amount of Your insurance for this Covered Risk is subject to Your Deductible Amount and Our Maximum Dollar Limit of Liability shown in Schedule A.
17. You cannot use the Land because use as a single-family residence violates an existing zoning law or zoning regulation.
18. You are forced to remove or remedy Your existing structures because they encroach onto Your neighbor's Land. If the encroaching structures are boundary walls or fences, the amount of Your insurance for this Covered Risk is subject to Your Deductible Amount and Our Maximum Dollar Limit of Liability shown in Schedule A.
19. Someone else has a legal right to, and does, refuse to perform a contract to purchase the Land, lease it or make a Mortgage loan on it because Your neighbor's existing structures encroach onto the Land.
20. You are forced to remove Your existing structures because they encroach onto an easement or over a building set-back line, even if the easement or building set-back line is excepted in Schedule B.
21. Your existing structures are damaged because of the exercise of a right to maintain or use any easement affecting the Land, even if the easement is excepted in Schedule B.
22. Your existing improvements (or a replacement or modification made to them after the Policy Date), including lawns, shrubbery or trees, are damaged because of the future exercise of a right to use the surface of the Land for the extraction or development of minerals, water or any other substance, even if those rights are excepted or reserved from the description of the Land or excepted in Schedule B.
23. Someone else tries to enforce a discriminatory covenant, condition or restriction that they claim affects Your Title which is based upon race, color, religion, sex, handicap, familial status, or national origin.
24. A taxing authority assesses supplemental real estate taxes not previously assessed against the Land for any period before the Policy Date because of construction or a change of ownership or use that occurred before the Policy Date.
25. Your neighbor builds any structures after the Policy Date – other than boundary walls or fences – which encroach onto the Land.
26. Your Title is unmarketable, which allows someone else to refuse to perform a contract to purchase the Land, lease it or make a Mortgage loan on it.
27. A document upon which Your Title is based is invalid because it was not properly signed, sealed, acknowledged, delivered or recorded.
28. The residence with the address shown in Schedule A is not located on the Land at the Policy Date.
29. The map, if any, attached to this Policy does not show the correct location of the Land according to the Public Records.

## Our Duty To Defend Against Legal Actions

We will defend Your Title in any legal action only as to that part of the action which is based on a Covered Risk and which is not excepted or excluded from coverage in this Policy. We will pay the costs, attorneys' fees, and expenses We incur in that defense.

We will not pay for any part of the legal action which is not based on a Covered Risk or which is excepted or excluded from coverage in this Policy. **This Policy is not complete without Schedules A and B.**

We can end Our duty to defend Your Title under paragraph 4 of the Conditions.

## EXCLUSIONS

In addition to the Exceptions in Schedule B, You are not insured against loss, costs, attorneys' fees, and expenses resulting from:

1. Governmental police power, and the existence or violation of any law or government regulation. This includes ordinances, laws and regulations concerning:
   a. building
   b. zoning
   c. Land use
   d. improvements on the Land
   e. Land division
   f. environmental protection
   This Exclusion does not apply to violations or the enforcement of these matters if notice of the violation or enforcement appears in the Public Records at the Policy Date.
   This Exclusion does not limit the coverage described in Covered Risk 14, 15, 16, 17 or 24.

2. The failure of Your existing structures, or any part of them, to be constructed in accordance with applicable building codes. This Exclusion does not apply to violations of building codes if notice of the violation appears in the Public Records at the Policy Date.

3. The right to take the Land by condemning it, unless:
   a. a notice of exercising the right appears in the Public Records at the Policy Date; or
   b. the taking happened before the Policy Date and is binding on You if You bought the Land without Knowing of the taking.

4. Risks:
   a. that are created, allowed, or agreed to by You, whether or not they appear in the Public Records;
   b. that are Known to You at the Policy Date, but not to Us, unless they appeared in the Public Records at the Policy Date;
   c. that result in no loss to You; or
   d. that first occur after the Policy Date - this does not limit the coverage described in Covered Risk 7, 8.d, 22, 23, 24 or 25.

5. Failure to pay value for Your Title.

6. Lack of a right:
   a. to any Land outside the area specifically described and referred to in paragraph 3 of Schedule A; and
   b. in streets, alleys, or waterways that touch the Land.
   This Exclusion does not limit the coverage described in

## CONDITIONS

Covered Risk 11 or 18.

1. **DEFINITIONS.**
   a. Easement - the right of someone else to use the Land for a special purpose.
   b. Known - things about which You have actual knowledge. The words "Know" and "Knowing" have the same meaning as Known.
   c. Land - the Land or condominium unit described in paragraph 3 of Schedule A and any improvements on the Land which are real property.
   d. Mortgage - a mortgage, deed of trust, trust deed or other security instrument.
   e. Natural Person - a human being, not a commercial or legal organization or entity. Natural Person includes a trustee of a Trust even if the trustee is not a human being.
   f. Policy Date - the date and time shown in Schedule A. If the insured named in Schedule A first acquires the interest shown in Schedule A by an instrument recorded in the Public Records later than the date and time shown in Schedule A, the Policy Date is the date and time the instrument is recorded.
   g. Public Records - records that give constructive notice of matters affecting Your Title, according to the state statutes where the Land is located.
   h. Title - the ownership of Your interest in the Land, as shown in Schedule A.
   i. Trust - a living trust established by a human being for estate planning.
   j. We/Our/Us -- Lawyers Title Insurance Corporation.
   k. You/Your - the insured named in Schedule A and also those identified in paragraph 2.b. of these Conditions.

2. **CONTINUATION OF COVERAGE.**
   a. This Policy insures You forever, even after You no longer have Your Title. You cannot assign this Policy to anyone else.
   b. This Policy also insures:
      (1) anyone who inherits Your Title because of Your death;
      (2) Your spouse who receives Your Title because of dissolution of Your marriage;
      (3) the trustee or successor trustee of a Trust to whom You transfer Your Title after the Policy Date; or
      (4) the beneficiaries of Your Trust upon Your death.
   c. We may assert against the insureds identified in paragraph 2.b. any rights and defenses that We have against any previous insured under this Policy.

3. **HOW TO MAKE A CLAIM.**
   a. Prompt Notice Of Your Claim
      (1) As soon as You Know of anything that might be covered by this Policy, You must notify Us promptly in writing.
      (2) Send Your notice to Lawyers Title Insurance Corporation, 5600 Cox Road, Glen Allen, VA 23060, Attention: Claims Department. Please include the Policy number shown in Schedule A, and the county

and state where the Land is located. Please enclose a copy of Your Policy, if available.
      (3) If You do not give Us prompt notice, Your coverage will be reduced or ended, but only to the extent Your failure affects Our ability to resolve the claim or defend You.
   b. Proof Of Your Loss
      (1) We may require You to give Us a written statement signed by You describing Your loss which includes:
         (a) the basis of Your claim;
         (b) the Covered Risks which resulted in Your loss;
         (c) the dollar amount of Your loss; and
         (d) the method You used to compute the amount of Your loss.
      (2) We may require You to make available to Us records, checks, letters, contracts, insurance policies and other papers which relate to Your claim. We may make copies of these papers.
      (3) We may require You to answer questions about Your claim under oath.
      (4) If You fail or refuse to give Us a statement of loss, answer Our questions under oath, or make available to Us the papers We request, Your coverage will be reduced or ended, but only to the extent Your failure or refusal affects Our ability to resolve the claim or defend You.

4. **OUR CHOICES WHEN WE LEARN OF A CLAIM.**
   a. After We receive Your notice, or otherwise learn, of a claim that is covered by this Policy, Our choices include one or more of the following:
      (1) Pay the claim.
      (2) Negotiate a settlement.
      (3) Bring or defend a legal action related to the claim.
      (4) Pay You the amount required by this Policy.
      (5) End the coverage of this Policy for the claim by paying You Your actual loss resulting from the Covered Risk, and those costs, attorneys' fees and expenses incurred up to that time which We are obligated to pay.
      (6) End the coverage described in Covered Risk 14, 15, 16 or 18 by paying You the amount of Your insurance then in force for the particular Covered Risk, and those costs, attorneys' fees and expenses incurred up to that time which We are obligated to pay.
      (7) End all coverage of this Policy by paying You the Policy Amount then in force, and all those costs, attorneys' fees and expenses incurred up to that time which We are obligated to pay.
      (8) Take other appropriate action.
   b. When We choose the options in paragraphs 4.a. (5), (6) or (7), all Our obligations for the claim end, including Our obligation to defend, or continue to defend, any legal action.
   c. Even if We do not think that the Policy covers the claim, We may choose one or more of the options above. By doing so, We do not give up any rights.

3

5.  **HANDLING A CLAIM OR LEGAL ACTION.**
a.  You must cooperate with Us in handling any claim or legal action and give Us all relevant information.
b.  If You fail or refuse to cooperate with Us, Your coverage will be reduced or ended, but only to the extent Your failure or refusal affects Our ability to resolve the claim or defend You.
c.  We are required to repay Us only for those settlement costs, attorneys' fees and expenses that We approve in advance.
d.  We have the right to choose the attorney when We bring or defend a legal action on Your behalf. We can appeal any decision to the highest level. We do not have to pay Your claim until the legal action is finally decided.
e.  Whether or not We agree there is coverage, We can bring or defend a legal action, or take other appropriate action under this Policy. By doing so, We do not give up any rights.

6.  **LIMITATION OF OUR LIABILITY.**
a.  After subtracting Your Deductible Amount if it applies, We will pay no more than the least of:
    (1) Your actual loss;
    (2) Our Maximum Dollar Limit of Liability then in force for the particular Covered Risk, for claims covered only under Covered Risk 14, 15, 16 or 18; or
    (3) the Policy Amount then in force;
    and any costs, attorneys' fees and expenses which We are obligated to pay under this Policy.
b.  (1) If We remove the cause of the claim with reasonable diligence after receiving notice of it, all Our obligations for the claim end, including any obligation for loss You had while We were removing the cause of the claim.
    (2) Regardless of 6.b. (1) above, if You cannot use the Land because of a claim covered by this Policy:
        (a) You may rent a reasonably equivalent substitute residence and We will repay You for the actual rent You pay, until the earlier of:
            (1) the cause of the claim is removed; or
            (2) We pay You the amount required by this Policy. If Your claim is covered only under Covered Risk 14, 15, 16 or 18, that payment is the amount of Your insurance then in force for the particular Covered Risk.
        (b) We will pay reasonable costs You pay to relocate any personal property You have the right to remove from the Land, including transportation of that personal property for up to twenty-five (25) miles from the Land, and repair of any damage to that personal property because of the relocation. The amount We will pay You under this paragraph is limited to the value of the personal property before You relocate it.
c.  All payments We make under this Policy reduce the Policy Amount, except for costs, attorneys' fees and expenses. All payments we make for claims which are covered only under Covered Risk 14, 15, 16 or 18 also reduce Our Maximum Dollar Limit of Liability for the particular Covered Risk, except for costs, attorneys' fees and expenses.
d.  If We issue, or have issued, a Policy to the owner of a Mortgage on Your Title and We have not given You any coverage against the Mortgage, then
    (1) We have the right to pay any amount due You under this Policy to the owner of the Mortgage to reduce the amount of the Mortgage, and any amount paid shall be treated as a payment to You under this Policy, including under paragraph 4.a. of these Conditions;

    (2) Any amount paid to the owner of the Mortgage shall be subtracted from the Policy Amount of this Policy; and
    (3) If Your claim is covered only under Covered Risk 14, 15, 16 or 18, any amount paid to the owner of the Mortgage shall be subtracted from Our Maximum Dollar Limit of Liability for the particular Covered Risk.
e.  If You do anything to affect any right of recovery You may have against someone else, We can subtract from Our liability the amount by which You reduced the value of that right.

7.  **TRANSFER OF YOUR RIGHTS TO US.**
a.  When We settle Your claim, We have all the rights You have against any person or property related to the claim. You must transfer these rights to Us when We ask, and You must not do anything to affect these rights. You must let Us use Your name in enforcing these rights.
b.  We will not be liable to You if We do not pursue these rights or if We do not recover any amount that might be recoverable.
c.  We will pay any money We collect from enforcing these rights in the following order:
    (1) to Us for the costs, attorneys' fees and expenses We paid to enforce these rights;
    (2) to You for Your loss that You have not already collected;
    (3) to Us for any money We paid out under this Policy on account of Your claim; and
    (4) to You whatever is left.
d.  If You have rights under contracts (such as indemnities, guaranties, bonds or other policies of insurance) to recover all or part of Your loss, then We have all of those rights, even if those contracts provide that those obligated have all of Your rights under this Policy.

8.  **ENTIRE CONTRACT.**
This Policy, and any endorsements, is the entire contract between You and Us. To determine the meaning of any part of this Policy, You must read the entire Policy. Any changes to this Policy must be agreed to in writing by Us. Any claim You make against Us must be made under this Policy and is subject to its terms.

9.  **INCREASED POLICY AMOUNT.**
The Policy Amount will increase by ten percent (10%) of the Policy Amount shown in Schedule A each year for the first five years following the Policy Date shown in Schedule A, up to one hundred fifty percent (150%) of the Policy Amount shown in Schedule A. The increase each year will happen on the anniversary of the Policy Date shown in Schedule A.

10. **SEVERABILITY.**
If any part of this Policy is held to be legally unenforceable, both You and We can still enforce the rest of this Policy.

11. **ARBITRATION.**
a.  If permitted in the state where the Land is located You or We may demand arbitration.
b.  The arbitration shall be binding on both You and Us. The arbitration shall decide any matter in dispute between You and Us.
c.  The arbitration award may be entered as a judgment in the proper court.
d.  The arbitration shall be under the Title Insurance Arbitration Rules of the American Arbitration Association. You may choose current Rules or Rules in existence on Policy Date.
e.  The law used in the arbitration is the law of the place where the Land is located.
f.  You can get a copy of the Rules from Us.

---

## THANK YOU.

Title insurance provides for the protection of your real estate investment. We suggest you keep this policy in a safe place where it can be readily available for future reference.

If you have questions about title insurance or the coverage provided by this policy, contact the office that issued this policy, or you may call or write:

Lawyers Title Insurance Corporation
Consumer Affairs
P.O. Box 27567
Richmond, Virginia 23261-7567
telephone, toll free: 800 446-7086
web: www.landam.com

We thank you for choosing to do business with Lawyers Title Insurance Corporation, and look forward to meeting your future title insurance needs.

Lawyers Title Insurance Corporation
is a member of the LandAmerica family of title insurance underwriters.

---


LandAmerica
Lawyers Title

4

B 1086-202Z

File/Order No.: 04101724



## CLTA HOMEOWNER'S POLICY OF TITLE INSURANCE

ISSUED BY

### Lawyers Title Insurance Corporation
### SCHEDULE A

| POLICY AMOUNT | PREMIUM | DATE AND TIME OF POLICY |
|---|---|---|
| **$5,300,000.00** | **$7,584.00** | **August 21, 2007 at 8:00 A.M.** |
| | Endorsement Fees: **$0.00** | |

Deductible Amounts and Maximum Dollar Limits of Liability for Covered Risk 14, 15, 16 & 18:

| | Your Deductible Amount | Our Maximum Dollar Limit of Liability |
|---|---|---|
| Covered Risk 14: | 1% of Policy Amount or $2,500.00 (whichever is less) | $10,000.00 |
| Covered Risk 15: | 1% of Policy Amount or $5,000.00 (whichever is less) | $25,000.00 |
| Covered Risk 16: | 1% of Policy Amount or $5,000.00 (whichever is less) | $25,000.00 |
| Covered Risk 18: | 1% of Policy Amount or $2,500.00 (whichever is less) | $5,000.00 |

Street address of the land: 1355 East Mountain Drive, Santa Barbara, CA 93108

1. NAME OF INSURED:

   **R. Scott Turicchi and Lannette C. Turicchi**

2. YOUR INTEREST IN THE LAND COVERED BY THIS POLICY IS:

   **A FEE**

3. THE LAND REFERRED TO IN THIS POLICY IS SITUATED IN THE COUNTY OF **Santa Barbara**, STATE OF **California**, AND IS MORE PARTICULARLY DESCRIBED IN EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.

By: *Theodore L Chandler*
Authorized Signatory

Page 1

CLTA Homeowner's Policy of Title Insurance (6/2/98)
ALTA Homeowner's Policy of Title Insurance (10/17/98)